NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JANNY NIEVES, | : | Civil Action No.: 14-7676 (MCA) |
| Petitioner, | : |  |
| v. | : | **OPINION** |
| PATRICK NOGAN, *et al.*, | : |  |
| Respondent. | : |  |

APPEARANCES:

Janny Nieves
Midstate Correctional Facility
P.O. Box 866
Wrightstown, NJ 08562
         Petitioner, *pro se*

Maria Ines Guerrero
Essex County Prosecutor's Office
50 West Market Street
Newark, NJ 07102
         On behalf of Respondents

**ARLEO, UNITED STATES DISTRICT JUDGE**

## I.    INTRODUCTION

Before this Court is the Petition for a writ of habeas corpus of Petitioner Janny Nieves ("Petitioner"), brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) For the reasons set forth below, Petitioner's habeas petition is DENIED, and Petitioner is DENIED a certificate of appealability.

## II.    FACTUAL BACKGROUND & PROCEDURA HISTORY

The following factual summary is taken from the opinion of the Superior Court of New Jersey, Appellate Division, affirming the denial of post-conviction relief ("PCR"):

> Defendant was charged with first-degree murder, contrary to N.J.S.A. 2C:11–3(a)(1) and N.J.S.A. 2C:11–3(a)(2); and second-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24–4. Defendant's motion to suppress certain statements he made to law enforcement was denied. Thereafter, defendant was tried before a jury.

> At the trial, the State presented evidence, which established that Yadira Obando (Obando) and defendant were involved in a romantic relationship, and Obando became pregnant with defendant's child. She gave birth to J.N. in February 2001. In April 2001, defendant and Obando moved to an apartment in Newark, which they shared with others.

> Obando testified that she and defendant constantly argued and often engaged in physical altercations, in which defendant would strike her. She said defendant hit the child and often shook her to get her to stop crying. At some point prior to July 17, 2001, defendant told Obando that he dropped the baby. The baby was not reacting, but defendant and Obando did not take the child to see a doctor. The child seemed to recover.

> J.N. was not well on July 17, 2001, and Obando and defendant took the child to the emergency room of a hospital in Newark. A pediatric nurse examined the child, and she seemed to be in good physical condition, but appeared to have an ear infection and upper respiratory congestion. The nurse consulted with a doctor and medication was prescribed.

> According to Obando, sometime between July 17, 2001 and July 21, 2001, defendant struck J.N. in the back. However, neither defendant nor Obando took the child to the hospital after this incident. On July 21 or 22, the child was lethargic and she was vomiting. Obando said that on July 23, defendant struck her and also struck J.N. Obando left defendant alone with the child in their bedroom.

Thirty minutes later, Obando returned to feed the child. She said defendant was holding the baby and appeared to be trying to get the child to react. The baby's eyes were closed and she would not open them. Obando and defendant took the child to the hospital. The child was not breathing. She was transported to Beth Israel Hospital and placed in a pediatric intensive care unit (ICU). The child died on July 26, 2001.

The State presented medical testimony indicating that J.N. had a bruise on the right side of her brain, a right temporal fracture and multiple right parietal fractures. The child also had multiple rib fractures, injuries to her liver and adrenal bruising. Dr. Timothy Yeh (Dr. Yeh), the attending physician at the pediatric ICU at Beth Israel where J.N. was treated, testified that the injuries occurred at different times and were not accidental.

Dr. Yeh testified that J.N.'s injuries were consistent with being shaken. The child's brain injuries were caused by significant force, by direct impact or shaking. He opined that the rib fractures were caused by a squeezing type of force. He said the injuries to the child's liver and adrenal bruising were caused by an impact to her back or abdomen.

Dr. Wayne Williams, the Assistant Medical Examiner in the Regional Medical Examiner's Office in Newark, performed the autopsy on July 27, 2001. He stated that the cause of death was blunt force injuries to the child's head, chest and abdomen.

The jury found defendant not guilty of murder, but guilty of a lesser-included offense, first-degree aggravated manslaughter. The jury also found defendant guilty of second-degree endangering the welfare of a child.

The trial court later denied defendant's motion for a new trial and sentenced defendant to twenty-five years of imprisonment on the aggravated manslaughter charge, with a period of parole ineligibility as prescribed by the No Early Release Act, N.J.S.A. 2C:43–7.2. The court also sentenced defendant to a concurrent, eight-year term on the endangering charge, and imposed various monetary sanctions.

*State v. Nieves*, Indictment No. A-2177-11T3, 2013 WL 3213690, at *1–2 (N.J. Super. Ct. App.

Div. June 27, 2013).

Petitioner appealed his conviction and sentence. The Appellate Division affirmed on October 4, 2005 but remanded for matters related to his sentencing. *State v. Nieves*, Indictment No. A-4274-03T4, 2005 WL 2447795 (N.J. Super. Ct. App. Div. Oct. 4, 2005). The New Jersey Supreme Court denied certification on February 18, 2009. *State v. Nieves*, 966 A.2d 1079 (N.J. 2009). Petitioner filed a petition for PCR which was denied by the Superior Court on August 30, 2011. (ECF No. 13-13.) Petitioner appealed, and the Appellate Division affirmed the denial of PCR on June 27, 2013. *Nieves*, 2013 WL 3213690. The New Jersey Supreme Court denied certification on February 4, 2014. *State v. Nieves*, 87 A.3d 771 (N.J. 2014). In December 2015, Petitioner filed a habeas Petition with this court raising five grounds for habeas relief:

1. Trial court erred in denying a motion for acquittal.

2. Trial court erred in permitting statements introduced.

3. Trial court erred in restricting cross-examination of [P]etitioner's co-defendant.

4. Trial court erred in failing to charge aggravated assault.

5. Petitioner was deprived [of] the effective assistance of counsel at trial.

(ECF No. 1 at 5–12.)

Respondents submitted an answer in which they argue that Petitioner's claims are meritless, the Petition is time-barred, and Grounds Four and Five are procedurally barred from habeas review. (ECF No. 10.)

### III.    STANDARD OF REVIEW

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim

presented in his petition. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Price v. Vincent*, 538 U.S. 634, 641 (2003). District courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under these standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). Furthermore, "when the relevant state-court decision on the merits . . .does not come accompanied with . . . reasons . . . [w]e hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

IV. **ANALYSIS**

   **A. Ground One: Motion for Acquittal**

   In Ground One, Petitioner alleges that the trial court erred in failing to grant his motion for a judgment of acquittal. (ECF No. 1-2 at 27–31.) He argues that there was a variance between the indictment date of July 26, 2001, and the evidence presented at trial which reflected acts committed before that date. Because of this variance, Petitioner claims that he was prevented from presenting an effective defense. The Appellate Division, on direct appeal, found the claim meritless without extended explanation. *See Nieves*, 2005 WL 2447795, at *1.

   The record reflects that the indictment charged Petitioner for crimes committed "on the 26th day of July, 2001." (ECF No. 13-1 at 4–5.) At the conclusion of the State's case, defense counsel moved for a judgment of acquittal arguing that no evidence was presented that Petitioner "did anything on the 26th of July to this child." (ECF No. 13-29 at 35.) The trial court denied the motion as follows:

   > With respect to [the] defense motion for judgment of acquittal, the broad test for such an application is whether evidence at that point [i]n time is sufficient to warrant a conviction on the charge involved. Specifically[,] the question the trial judge must determine is whether viewing the State's evidence in its entirety, be that direct or circumstantial, giving the State the benefit of all its favorable testimony[,] as well as all the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charges beyond a reasonable doubt. Clearly the State has so demonstrated that with respect to both the first and second counts. I don't need to repeat the evidence which was submitted during the course of the trial, it speaks for itself. Counsel has made specific argument with respect to the fact that the indictment alleges endangering the welfare of a child, which occurs specifically on the date of July 26th, which coincidentally, not coincidentally, is the date of death. In the indictment, of course, [serves] as notice to an accused of charges being brought against him so he is able to properly defend himself or herself against such charges. Broad discovery was provided to defendant which detailed the specific allegations of when the endangering took place and the endangering

> consisted of, as offered by the State in its case, the care given to this child, including the abuse suffered by the child during the course of the months as we discussed in the testimony. The defendant had notice of what the charges were, had notice of when it took place. The mere fact that the indictment returned referred to only the date of death, isn't making that defective. The motion is denied.

(ECF No. 13-29 at 42–43.)

In assessing whether a variance violates a petitioner's constitutional rights "[t]he true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82 (1935) (citations omitted). "The general rule that allegations and proof must correspond is based upon the obvious requirements . . . that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial . . ." *Id.* Based upon the analysis in *Berger*, the Third Circuit has found that "a variance violates the Constitution only if it is likely to have surprised or otherwise has prejudiced the defense." *Real v. Shannon*, 600 F.3d 302, 303 (3d Cir. 2010).

Here, while the indictment alleged a single date, the trial court's decision denying this claim was neither contrary to, nor an unreasonable application of Supreme Court precedent. The trial court noted that broad discovery was provided to the defense, detailing allegations over the course of the short time the baby was alive. *See* 28 U.S.C. § 2254(e)(1) (explaining that on federal habeas review "a determination of a factual issue made by a State court shall be presumed to be correct."). Thus, Petitioner was sufficiently informed of the charges against him to put him on notice to prepare an effective defense. *See Russell v. United States*, 369 U.S. 749, 763 (1962) (recognizing that the sufficiency of an indictment is measured by "whether the indictment contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet") (internal quotations omitted); *see also United States v. Somers*, 496

F.2d 723, 746 (3d Cir. 1974) (finding that a variance does not rise to the level of a constitutional violation unless the defendant was "so surprised by the proof adduced that he was unable to prepare his defense adequately"); *but see Real*, 600 F.3d at 308 (finding variance not unconstitutional, in part, because indictment there contained language of "*on or about*" the specific date) (emphasis added).

Furthermore, Petitioner has not shown that he was prejudiced by the evidence presented at trial. *Real*, 600 F.3d at 303. As noted above, the extensive evidence against Petitioner was presented to him prior to trial. *See United States v. Miller*, 527 F.3d 54, 70 (3d Cir. 2008) (finding that while government did not present direct evidence of crime committed on exact date in the indictment, variance did not prejudice petitioner's substantial rights because he was aware of government's evidence against him). Thus, the state courts' denial of the motion for a judgment of acquittal was not an unreasonable application of Supreme Court precedent.

To the extent Petitioner is making a general argument challenging the sufficiency of the evidence against him, "a reviewing court must ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A court sitting in habeas review may therefore overturn a conviction for insufficiency of the evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324). "Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).

Here, given the testimony from Obando that Petitioner repeatedly hit, shook, and dropped the baby (ECF No. 21–23), in addition to incriminating statements made by Petitioner that he dropped the baby on her head (ECF No. 13-22 at 17, 39), it is clear that a rational fact-finder could have found beyond a reasonable doubt that Petitioner engaged in the reckless killing and endangering the welfare of the victim. Because the evidence in this matter was clearly sufficient, the Appellate Division's rejection of Petitioner's claim was not unreasonable. Therefore, this claim for relief is claim.

## B. Ground Two: Right Against Self-Incrimination

In Ground Two, Petitioner argues that his constitutional rights were violated by the introduction of incriminating statements he made to the police. He explains that he was questioned by a police officer about the circumstances of the baby's injuries, without having been administered *Miranda* warnings, in a manner likely to elicit an incriminating response. (ECF No. 1-2 at 32.) The Appellate Division denied the claim as meritless without explanation. *See Nieves,* 2005 WL 2447795, at *1.

The record reveals that prior to trial a *Miranda* hearing was held in which Officer Thomas ("Thomas") testified regarding the circumstances of Petitioner's statement to him.[1] (ECF No. 13-22 at 16.) At the hearing, Thomas testified that Petitioner arrived at the hospital some-time after the victim's mother. (*Id.*) Thomas explained that the hospital was arranged with a waiting area with an inner conference room. (*Id.* at 14.) Inside the conference room was a D.Y.F.S. worker, a doctor, the victim's mother (Obando) and Thomas. (*Id.* at 19.) Other individuals such as a nurse, a translator, the doctor, and an Essex County prosecutor came in and out of the conference room.

---

[1]    The record of the *Miranda* hearing also reveals that Petitioner made various other incriminating statements. However, because the instant Petition only references his statement to Thomas, the Court will not address the other incriminating statements.

(*Id.* at 24–41.) About fifteen minutes after Petitioner arrived, Thomas said he needed to speak with Petitioner and waived for Petitioner to exit the conference room. (*Id.* at 31, 36–37.) He then asked Petitioner what happened to the baby. (*Id.* at 38.) Thomas read from his notes that Petitioner told him, "[t]he baby fell out of his arms and hit the concrete ground back in June . . . he was not taken to the hospital." (*Id.* at 39.) After Petitioner's statement to Thomas, they both returned to the conference room and Thomas did not question Petitioner further. (*Id.*) Thomas then testified that some-time later, after speaking with the doctor and the D.Y.F.S. worker, he placed Petitioner and Obando under arrest. (*Id.* at 41.) Thomas testified that from start to finish, Petitioner was questioned by various individuals over the course of an hour. (*Id.* at 41.) Thomas also stated that he identified himself as an officer, he was in uniform and armed, but never told Petitioner that he was there to investigate a crime. (*Id.* at 30.)

Based on the testimony elicited at the *Miranda* hearing, the trial court found Petitioner's statement to Thomas admissible, explaining on the record:

> I make the following findings beyond a reasonable doubt:
>
> The defendants brought their child to Columbus Hospital when sick and the child was transferred to the critical care unit at Newark Beth Israel Hospital. The parents were there for the purpose of obtaining care and medical treatment for their sick child. They were not under any form of nature of restraint. They were not detained in any way, shape, manner or form. Evidence of that is the fact, for example, that Mr. Nieves didn't even get there until later. Evidence of that is that there is testimony about people going in and out of the room, including hospital people.
>
> The testimony was that at the end of the whole discussion, that everybody -- the defendants, if you recall, were arrested in the hallway outside. They were -- they were not restrained in any way. Nobody suggested that they couldn't leave if they -- earlier if they wanted to. The conditions that were there were not in any way conducive to leading any reasonable person to believe that . . . there was any kind of custodial setting. The fact that Officer Thomas was there . . . in uniform . . . with a gun in his holster, I guess, and Ms.

Bizek was there, as I -- as I had known to be, perhaps, as a representative of the Prosecutor's Office, but so was the nurse to the DYFS people.

While there may have been interrogation, I don't think there's a whole lot of doubt about that, whether it be by the doctors or by the DYFS workers, because interrogation is any words of action, that -- that part of the police -- that the police should know or reasonably likely to elicit any incriminating response from the suspect and you want to consider, at least, the DYFS worker being there -- being part of that process.

I suppose one can argue, pursuant to *Rhode Island v. Innis*, 446 U.S. 291, at Page 301 . . . that there was question. Whether or not it was likely to elicit an incriminating response from the suspect is an open question, but . . . I'll give the defendants the benefit of the doubt on that issue.

But I do say that there is no evidence to believe that the police were intending to elicit an incriminating response, in any event. I believe, under the circumstances, while the subjective intent of the police is not necessarily controlling and, in fact, it's the -- it's the object of circumstances that -- that are more relevant, the subjective circumstances are relevant to character -- are relevant to the extent that it helps characterize the objective circumstances. And I don't believe that the design of the questions was to elicit an incriminating response from the accused. I[t] simply -- it was simply more to figure out what was going on with the child and to obtain information, both [of] which was necessary to treat the child and what injuries were suffered and how to deal with them, but as well to . . . investigate the crime. So there was an aspect of it there. So I think it's fair to say that we're talking about interrogation and I'll leave it at that.

On the other hand, the issue is whether or not it was custodial. Custody does not require a formal arrest. It does not require physical restraint. It does not require handcuffs. The issue is what a reasonable person, innocent of crime, in a defendant's position, would have thought. And that, of course, is *State v. Godfrey*, 131 N.J. Super 168, Affirmed 67 N.J. 267, *State v. Michelene* (phonetic), 220 N.J. Super. 532 cert. den. 109 N.J. 40, *State v. McLaughlin*, 310 N.J. Super. 242 cert. den. 156 N.J. 381.

I have to analyze, and I think the arguments that counsel made, what were the totality of the circumstances? What was the length of the interrogation? Was it a long or a short one? It was short. It was

approximately an hour. What kind of tension was involved? It was not really tension at all. The people were free to go. It was a conference room in a hospital.

That has to do with another issue, place. The surroundings. Where did it occur? Was it in a police station or was it in a hospital? There it was in a hospital.

The nature of the questions had to do with what had happened to the child and what was causing the child problems. The -- the language used in the questioning . . . by the doctor, by the DYFS worker. There's no suggestion that the questioning was accusatory in any way.

The investigators were not familiar with the defendant. There's no evidence of any pressure applied. Really, this is not very far . . . [from] the home of the defendant during the day, with his father nearby, that was the place of the interview in *State v. P.Z.*, 152 N.J. 86, but the circumstances surrounding the interview by the caseworker, by the detective, by the policeman and by the -- the doctor do not demonstrate a coercive atmosphere. Do not demonstrate the defendant -- the defendants did not have complete freedom to come and go. The -- the questions were not threatening. The interview was not lengthy.

There is no suggestion that the -- the suspects knew that they were the focus of any police investigation and there's no suspect -- there's no evidence that the -- in fact, at that point in time they were the suspect of any -- of any investigation at that point. And there's no suggestion that the -- a reasonable person, under those circumstances, would have thought themselves to be a target of the Prosecutor's investigation and, therefore, not free to leave.

. . .

I'm satisfied in the circumstances, this was a statement [to] Officer Thomas [that] was not a custodial interrogation, that *Miranda* did not apply.

(ECF No. 13-23 at 98–103.)

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court emphasized that the privilege against self-incrimination protects individuals from "informal

compulsion exerted by law-enforcement officers during in-custody questioning." 384 U.S. 436, 461 (1966). To protect against the coercive effect of a custodial interrogation, the Supreme Court requires law enforcement officers to recite what have come to be known as *Miranda* warnings to criminal suspects prior to questioning. *Id.* at 479.

A person is only subject to a custodial interrogation, however, when both the elements of custody and interrogation are satisfied. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). A criminal suspect is in custody if, given the circumstances surrounding the interrogation, "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Interrogation within the meaning of *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to an arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. The focus is on the "perceptions of the subject, rather than the intent of the police." *Id.*

The state court decision on this matter was neither contrary to, nor an unreasonable application of *Miranda* and its progeny. The record does not establish that a custodial interrogation took place. As noted by the state court and verified by the record, Petitioner arrived after the victim's mother, various individuals came in and out of the hospital conference room. Thomas did not indicate that Petitioner was not free to leave, and he did not express that Petitioner was the subject of an investigation. Further, the questioning took place in a hospital setting. Thomas never actively displayed his weapon, and he did not force Petitioner to speak with him. *See United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (highlighting five factors to consider in determining if a suspect is objectively free to leave: "whether the officers told the suspect he was under arrest or free to leave", the "location or physical surroundings of the interrogation", the "length of the

13

interrogation", "whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint" and "whether the suspect voluntarily submitted to questioning.") (citation omitted). Instead, Officer Thomas simply asked Petitioner what had happened to the baby. Officer Thomas did not "subject [Petitioner] to a 'lengthy harangue,' nor did [he] make 'comments [that] were particularly evocative.'" *See United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Innis* 446 U.S. at 303). Thus, the state court did not unreasonably find that a person in Petitioner's shoes would have felt free to terminate the questioning. *See Keohane*, 516 U.S. at 112. Because the state court decision on this matter was not an unreasonable application of Supreme Court precedent, the claim for habeas relief is denied.

### C. Ground Three: Confrontation Clause

In Ground Three, Petitioner argues that his Sixth Amendment rights were violated when the trial court restricted cross-examination of his co-defendant, Yadira Obando, regarding her son in Peru and her treatment for depression. (ECF No. 1-2 at 37.) He argues that this violated his rights under the Confrontation Clause. (*Id.*) The Appellate Division summarily rejected this claim when raised by Petitioner on direct appeal. *See Nieves*, 2005 WL 2447795, at *1.

The record establishes that during *voir dire* of Ms. Obando, the trial court considered defense counsel's request to cross-examine Obando about her treatment for depression and her reasons for leaving a son in Peru. (ECF No. 13-25 at 8–15.) Defense counsel was aware of these facts from the transcript of Obando's plea agreement. Defense counsel argued it was relevant to bolster his theory of the case—that Obando was an unfit mother who caused the death of her child.

The trial court, with the agreement of both parties, agreed that it was permissible for defense counsel to question Obando about her treatment for depression. (ECF No. 13-25 at 10.) Thus, on the aspect of depression, Petitioner's argument is belied by the record. Regarding the

child in Peru, however, the trial court determined it was irrelevant and restricted defense counsel from cross-examining Obando on that matter:

> COURT: All right. The last -- the issue with respect to the child in Peru. I'm going to read the pertinent part of the transcript [of the guilty plea]. This is Miss Scocozza['s] questions to Miss Obando.
>
> > "What year did you come to the United States?
> >
> > "In 1998.
> >
> > "And did you have family in Peru?
> >
> > "Yes.
> >
> > "Specifically do you have a son in Peru?
> >
> > "Yes.
> >
> > "How old was your son when you left Peru?
> >
> > "Almost Five.
> >
> > "And why did you leave your son behind in Peru?
> >
> > "For giving him a better life and a better education."
>
> [COURT:] I think it would be speculative on the defense part to make an argument that she left him there because she was inferentially an unfit mother. So in that regard I'm going to disallow it.
>
> DEFENSE COUNSEL: Just to be clear, I can't go into the other child in Peru or the circumstances by which she left that child; is that accurate?
>
> COURT: That's accurate. It's not relevant.

(ECF No. 13-25 at 15.)

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. "[T]he main and essential purpose of confrontation is *to secure for the opponent the opportunity*

of cross-examination.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal citations and quotation marks omitted) (emphasis in original). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Id.* at 680 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). Significantly, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 679 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)) (emphasis excluded); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted").

In applying *Van Arsdall*, the Third Circuit has explained that "the denial of cross-examination upon a proper subject for cross-examination is a ground for reversal if the denial appears to have been harmful." *United States v. Riggi*, 951 F.2d 1368, 1376 (3d Cir. 1991). "Whether the denial [of cross-examination] appears to have been harmful depends on the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." *Id.*

The state court decision on this matter was neither contrary to, nor an unreasonable application of Supreme Court precedent. Petitioner has failed to demonstrate that he was harmed

by the trial court's decision to limit the scope of cross-examination. *See Riggi*, 951 F.2d at 1376. The defense theory of the case was that Obando was an unfit mother who caused the death of her child. The judge permitted defense counsel to question the witness about her depression. The record reflects that he did so consistently throughout trial. (ECF No. 13-28 at 40; ECF No. 13-30 at 11.) Thus, defense counsel was able to pursue his theory of the case, through which the jury could draw appropriate inferences about the witness. *Van Arsdall*, 475 U.S. at 680.

With respect to the child in Peru, defense counsel hoped to bolster his theory of the case based on extremely limited information gleaned from the plea agreement record. Because cross-examination may be limited in the interests of fairness and reliability, *see Crane*, 476 U.S. at 690, the trial court's decision finding the evidence speculative and irrelevant was not unreasonable. *See United States v. Friedman*, 658 F.3d 342, 356–57 (3d Cir. 2011) (holding that because "limitation on cross-examination did not inhibit [defense] argument", and "limitation was reasonable" it did not deny defendant's right to confront witnesses). Because the state court did not unreasonably apply federal law, this claim for relief is denied.

### D. Ground Four: Failure to Charge Aggravated Assault

In Ground Four Petitioner alleges that the trial court erred in failing to charge the jury on aggravated assault as a lesser-included offense to murder. (ECF No. 1 at 10.) In support of his claim, he explains that "[e]vidence existed [P]etitioner punched his co-defendant and some punches contacted the victim . . . supporting the fact he was guilty of only aggrav[a]ted assault[.]" (ECF No. 1 at 10.) Petitioner raised this issue on appeal, and the Appellate Division found the claim meritless without further explanation.[2] *See Nieves*, 2005 WL 2447795, at *1.

---

[2]     Respondents contend that Grounds Four and Five are procedurally defaulted. To the extent the claims are procedurally defaulted, this Court denies the claims on the merits. *See Hameen v. Delaware*, 212 F.3d 226, 251–51 (3d Cir. 2000) (extending 28 U.S.C. § 2254(b)(2)—which

Petitioner's claim appears to rest on matters of state law. "[I]t is not the province of a federal habeas court to re-examine state court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Consistent with this clearly established federal law, questions relating to jury charges are normally matters of state law, and do not constitute claims for federal habeas review. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.* at 71–72.

However, to the extent Petitioner's argument can be construed as a federal claim, a habeas court must consider "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process . . . not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (internal citation and quotation marks omitted). A state trial court's refusal to give a requested jury instruction does not, by itself, create a federal habeas claim. Instead, a habeas petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation and quotation marks omitted). The error must have resulted in "actual prejudice." *Id.* at 637 (citation omitted).

Significantly, the Supreme Court has never recognized that an individual has a due process right to jury instructions on lesser-included offenses in non-capital cases. *See, e.g., Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[o]utside of the capital context, we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error"); *Beck v. Alabama*, 447 U.S. 625, 627 (1980) (holding it unconstitutional to impose a sentence of death

---

permits a federal court to deny unexhausted claims on the merits—to instances of procedural default).

18

"when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense").

At the charging conference, the judge noted that defense counsel requested a jury instruction on aggravated assault as a lesser-included offense to murder. (ECF No. 13–29 at 43.) The trial judge declined to give the charge, stating he had not located any case law indicating it should be charged. (ECF No. 13–29 at 6.)

The state court decision on this matter was not objectively unreasonable. The state court found that the evidence did not support an instruction on aggravated assault. Based on the record, the Court agrees and finds that Petitioner was not deprived of a fair trial by the omission of a jury charge on aggravated assault. Dr. Timothy Yeh, a State's witness, testified that the baby's death was caused by multiple wounds inflicted that were not accidental. (ECF No. 13-26 at 74–75.) Dr. Yeh explained that the victim's injuries were the result of persistent pressure on the baby's bones and were consistent with being shaken. (*Id.*) Dr. Mark Rosovsky testified that the victim's fractures were consistent with children who suffer non-accidental trauma, as the result of "someone squeeze[ing] the baby too tight." (ECF No. 13-27 at 9.) He also testified that the brain injury was likely the result of "[s]omeone smash[ing] the baby against a hard surface". (*Id.*) Thus, Petitioner's theory that he hit Obando and "some punches contacted the victim" which resulted in the baby's death, is not supported by the record. Further, Petitioner told Officer Thomas that he had dropped the baby on her head. (ECF No. 13-22 at 17, 39.) Additionally, Obando testified that Petitioner hit the baby, shook her on more than one occasion, and dropped her. (ECF No. 21–23.) While Obando did testify that at times when Petitioner hit her he also hit the baby, the weight of evidence at trial indicated that the victim's death was non-accidental and did not result from punches directed at Obando. Consequently, there was no rational basis for the jury to convict on

19

aggravated assault, as suggested by Petitioner. The state court's decision in this regard was neither contrary to, nor an unreasonable application of Supreme Court precedent. Accordingly, Petitioner is not entitled to relief on this claim.

## E. Ground Five: Ineffective Assistance of Counsel

In his final claim for habeas relief, Petitioner argues that his trial counsel was ineffective in failing to interview two witnesses, Edwin Arca and his brother Eduardo Arca. He explains that the two individuals resided with Petitioner for a period and would have testified that "they never observed him injure the victim." (ECF No. 1 at 12.)

The Appellate Division on appeal from the denial of PCR denied this claim as follows:

> To establish a claim of ineffective assistance of counsel, a defendant must satisfy the two-part test established by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by our Supreme Court. *State v. Fritz*, 105 N.J. 42, 58 (1987). First, the defendant must show that his attorney "'made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment.'" *Id.* at 52 (quoting *Strickland, supra*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693).

> Second, the defendant must show that his attorney's "'deficient performance prejudiced the defense.'" *Ibid.* (quoting *Strickland, supra*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693). The defendant must establish that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Ibid.* (quoting *Strickland, supra*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698).

> Defendant alleged that his attorney was deficient because he failed to call two witnesses in his defense, specifically Edwin Arca and his brother Eduardo Arca. The PCR court correctly rejected this claim.

> Determining which witnesses to call to testify is one of the most difficult strategic decisions a trial attorney must make. *State v. Arthur*, 184 N.J. 307, 320 (2005).

> > A trial attorney must consider what testimony a witness can be expected to give, whether the

witness's testimony will be subject to effective impeachment by prior inconsistent statements or other means, whether the witness is likely to contradict the testimony of other witnesses the attorney intends to present and thereby undermine their credibility, whether the trier of fact is likely to find the witness credible, and a variety of other tangible and intangible factors. Therefore, like other aspects of trial representation, a defense attorney's decision concerning which witnesses to call to the stand is "an art," and a court's review of such a decision should be "highly deferential."

[*Id.* at 320–21 (citations omitted).]

Here, the PCR court correctly found that defendant was not denied the effective assistance of counsel because counsel did not call the Arca brothers at trial. Edwin Arca and his paramour shared the apartment with defendant and Obando at the time relevant to this case. According to defendant, Edwin would have testified that he did not mistreat or hurt the baby; however, Edwin was not present when defendant struck the child. Moreover, Eduardo never resided with defendant and his family.

The record therefore supports the PCR court's finding that the decision not to call these witnesses to testify at trial was objectively reasonable and defendant was not prejudiced by the absence of their testimony. As the court determined, defendant has not shown that the result here would have been different if the Arca brothers had testified in his defense.

*Nieves*, 2013 WL 3213690, at *3–4.

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *Id.* at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. To meet this prong, a

21

"convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The court must then determine whether, in light of all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness." *Hinton v. Alabama,* 134 S. Ct. 1081, 1088 (2014).

Second, a petitioner must establish that counsel's "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland,* 466 U.S. at 669. To establish prejudice, the defendant must show that "there is a reasonable probability that the result of trial would have been different absent the deficient act or omission." *Id.* at 1083. On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable. *Harrington,* 562 U.S. at 101.

In support of his PCR Petition, Petitioner submitted a certification in which he stated that Edwin Arca and his brother Eduardo Arca would have testified that Petitioner never hurt his child. (ECF No. 13-16 at 118–19.) The certification states that Edwin rented the house where Petitioner, Obando and the baby resided. (*Id.* at 118.) It further states that Edwin "was present at the home all the time when not working and was able to testify that I did not mistreat or hurt my child. . . . My attorney said that he had spoken with Mr. Arca but that his testimony would have been no help. Mr. Arca was present at the trial ready to testify but was not called." (*Id.*) Petitioner also stated that Eduardo Arca had previously moved out of the home but "was at the home a lot for meals and socializing and was also able to testify as to my care of my child." (*Id.* at 118–19.)

The Appellate Division's decision does not amount to an unreasonable application of *Strickland.* The certification alone is simply not enough to demonstrate that trial counsel was deficient in failing to call the witnesses. Obando testified that Petitioner mistreated her and the

victim in their bedroom, with no one else present. (ECF No. 13-28 at 37–38.) She also testified that Petitioner told her he dropped the victim outside. (*Id.* at 23.) The fact that these two witnesses would have allegedly testified that they never saw Petitioner mistreat the baby, does not account for the times when Petitioner was alone with Obando and the baby. Thus, Petitioner has failed to demonstrate that his counsel was deficient under *Strickland. See Henderson v. DiGuglielmo*, 138 F. App'x 463, 469 (3d Cir. 2005) ([c]ounsel's failure to call a witness is precisely the sort of strategic trial decision that *Strickland* protects from second-guessing.") (internal quotation marks and citation omitted); *Hess v. Mazurkiewicz*, 135 F.3d 905, 908 (3d Cir. 1998) ("[o]ur review of ineffective assistance of counsel claims does not permit us, with the benefit of hindsight, to engage in speculation about how the case might best have been tried. We therefore accord counsel's strategic trial decisions great deference.")

Moreover, even if trial counsel was deficient in not calling the Arca brothers as witnesses, Petitioner still has not proven that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland, supra*, 466 U.S. at 694. Petitioner made various incriminating statements, and Obando gave detailed testimony of his abuse of the child. Therefore, Petitioner has failed to demonstrate that calling the witnesses would have changed the outcome of the trial. Because the state court's reasoning does not amount to an unreasonable application of *Strickland*, this claim is denied.

## V.  CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution

of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is denied.

## VI. <u>CONCLUSION</u>

For the reasons stated above, the Petition for habeas relief is DENIED and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Dated: June 22-2018

Madeline Cox Arleo
United States District Judge